STANDARD AUTOMOTIVE PARTS COMPANY *v.*
EMPLOYMENT SECURITY COMMISSION.

1. Administrative Law and Procedure—Res Judicata.

Whether decisions of administrative tribunals are capable of being *res judicata* depends upon the nature of the administrative action involved, being applicable to administrative action that is characterized as judicial or quasi judicial, while inapplicable to administrative determinations of administrative, executive, or legislative nature.

2. Same—Res Judicata—Finding of Fact by Regional Director of National Labor Relations Board.

Finding of fact by regional director of national labor relations board in investigation of unfair labor practices charge against plaintiff that claimant was a supervisor *held,* not *res judicata* either to any subsequent consideration of that matter or in any collateral proceedings, since the director was merely acting as agent of the general counsel in investigating an unfair labor practice to determine whether there was sufficient merit to proceed into the judicial realm of the board (29 USCA, §§ 153, 160).

3. Unemployment Compensation—Labor Relations—Supervisors.

Claimant for unemployment compensation whose work had required that he exercise a limited control over his department, assign jobs, make recommendations as to status of employees, instruct them, and check their work, *held,* to have been a supervisor, by the very nature of his work under the disjunctive test contained in the labor-management relations act (29 USCA, § 152).

---

References for Points in Headnotes

[1, 2] 2 Am Jur 2d, Administrative Law §§ 496, 497.
[3] 48 Am Jur, Social Security, Unemployment Insurance and Retirement Funds § 34.
[4, 5] 48 Am Jur, Social Security, Unemployment Insurance and Retirement Funds § 38.
What amounts to "misconduct" which precludes benefits under unemployment compensation act to discharged employees. 146 ALR 243.

4. SAME—DISQUALIFICATION FOR BENEFITS—MISCONDUCT.

Finding of appeal board of the employment security commission that claimant's refusal to sign "loyalty oath" letter was not such conduct as to disqualify him for unemployment compensation, not being a wanton and willful disregard of the employer's interests, *held*, correct, and supported by the record (CLS 1961, § 421.29).

5. SAME—SUPERVISOR—DISQUALIFICATION FOR BENEFITS—MISCONDUCT —ASSISTANCE TO UNION.

Actual assistance to an organizing union by a supervisor could be considered misconduct disqualifying one for benefits under the employment security act, but mere refusal of such supervisor to sign a "loyalty oath" could not (CLS 1961, § 421.29).

Appeal from Muskegon; Beers (Henry L.), J. Submitted Division 3 March 8, 1966, at Grand Rapids. (Docket No. 29.) Decided June 28, 1966.

Ronnie E. Romans presented a claim for unemployment compensation after being discharged from employment by Standard Automotive Parts Company. Employment security commission held that claimant was disqualified from benefits as he was discharged for reasons constituting misconduct in connection with his work. On appeal the referee affirmed the commission. Claimant appealed to the employment security appeal board, which reversed the referee and granted benefits to claimant. Plaintiff employer appealed to Muskegon circuit court. Judgment for plaintiff. Claimant appeals. Reversed and remanded.

*Hathaway, Latimer, Clink & Robb (Richard A. Robb,* of counsel), for plaintiff.

*Marcus, McCroskey, Libner, Reamon, Williams & Dilley (Jerry S. McCroskey,* of counsel), for claimant Romans.

FITZGERALD, P. J.  The facts in this appeal from a
decision of the Muskegon county circuit court, re-
versing a decision of the Michigan employment se-
curity appeal board, are not in dispute and appear
as follows:

The employer is in the business of manufacturing
small automotive parts, parts for agricultural ma-
chinery and similar products.

The claimant was employed by Standard from
August 17, 1959, to the date of his discharge on
October 23, 1961.  He was paid on the basis of an
hourly rate and at the time of his discharge was
receiving $1.95 per hour.  The record does not in-
dicate in what capacity or classification the claimant
was originally hired, but some months before Janu-
ary 2, 1961, he was assigned to the lathe department
as assistant to the person in charge.  The purpose
of this assignment was to train and prepare the
claimant to succeed the person in charge, who was
scheduled to retire at the end of 1960.  The claimant
duly became the person in charge of the lathe depart-
ment on January 2, 1961.

As the person in charge of the lathe department,
the claimant's duties were to produce work accord-
ing to blueprints of parts on order in accordance
with schedules specified in work orders.  It was his
duty to deal with all problems connected with such
production.  On a given job, the claimant got the
blueprint and work order; he selected the appro-
priate machine; he set up or caused his assistant to
set up the machine and tooling; he made the neces-
sary machine adjustments and might run off enough
pieces to check the adjustments; he assigned the
particular operator—generally the one who had the
most experience in the required operation or the
one he deemed most fitted for the operation; he might
run off a few pieces for the purpose of instructing

the operator. The claimant checked the jobs in process from time to time to see that they were running properly and that quality standards were being maintained.

The claimant had no authority to hire since that function was performed by the employer's personnel department. He had no authority to discharge but could only recommend such action to his superintendent. He could deal with a minor disciplinary problem but was required to refer important ones to his superintendent. The claimant was authorized to grant "down" time to operators in the lathe department. When the amount of work in the lathe department was insufficient to utilize the operators there, the claimant could recommend the transfer of excess operators to other departments. The claimant was required, in the case of new employees in the lathe department, to indicate his judgment of their work and suitability by recommending or not recommending such employees for the periodic increases in pay. He was required to attend such supervisors' meetings at the plant which dealt with matters in which the claimant was concerned. The employer submitted the name of and paid the dues for the claimant in the Industrial Management Club of Greater Muskegon, and it appears that the claimant attended at least one meeting of that organization. The claimant's hourly rate of pay was about 20 cents more than the average hourly rate of the operators in the lathe department.

On or about October 19, 1961, the employer received a letter from the International Association of Machinists, AFL-CIO, stating that it was conducting an organizing campaign among the employees of the employer and enumerated the names of several of the company's employees who would be actively engaged in carrying on the campaign. The claimant was one of the organizers named.

The employer took the position that the claimant was a "supervisor" and that the claimant's activity as a union organizer would subject the employer to charges of unfair labor practices under the provisions of the labor-management relations act of 1947 as amended (29 USCA, § 141 *et seq.*). Accordingly, Standard's executive vice-president called the claimant and requested him to sign the following document.

"October 20, 1961

"I have seen a letter addressed to the company from the International Association of Machinists, dated October 19, 1961, which informs the company that the International Association of Machinists is conducting an organizational campaign to organize the employees of Standard Automotive Parts Company. This letter also lists the names of employees who 'will be actively engaged in carrying on this campaign'. My name, 'Ronnie E. Romans', is one of the names listed.

"I know that my position at Standard Automotive Parts Company is that of a 'supervisor'. Among other things done by me in my position is to assign work to the employees when I supervise, and I have from time to time made effective recommendations to the management regarding the status of employees, and I have signed reports to the management on such matters as whether or not a particular employee's work is of good quality or not, for purposes of determining whether the employee should be retained or terminated. I have used my own independent judgment in making those reports.

"I have been told by the management that, as a supervisor, I am a representative of the company, and that I cannot aid or assist in the formation of a labor organization or campaign for the union without involving the management in the unlawful act of aiding or assisting a labor organization. I have been told by the management that my duty is

to be neutral, and that unless I am willing to be neutral I will be terminated.

"It is my decision that I will remain neutral in this campaign. I will not become or remain a member of this labor organization or any other labor organization which seeks to represent any of the employees I supervise or who are sought to be organized. I will do nothing to assist, aid or promote the International Association of Machinists, or any other labor organization seeking to represent such employees, and I consent to the company's telling the employees that the International Association of Machinists must remove my name from the list of employees who will campaign for it.

"I state that I will not discriminate against any employees of the company because of their exercising or not exercising the rights set forth in the national labor relations act.

"I understand that if I should not so maintain my neutrality during this campaign, my employment will be terminated."

The claimant declined to sign the above-quoted document on the ground that he had never been told by the employer that he was a supervisor, and that he had been informed by the union about the propriety of his organizing activity. The claimant asked permission to make a phone call before he signed the document. This request was refused and the claimant was discharged.

On October 27, 1961, the International Association of Machinists, AFL-CIO, filed charges of unfair labor practices with the national labor relations board against the employer herein, alleging that the employer had "discriminatively terminated the employment of Ronnie Romans, a set-up operator, because of his membership and activities on behalf of the International Association of Machinists". The national labor relations board determined that the employer was engaged in interstate commerce

and subject to its jurisdiction. On December 6, 1961, the national labor relations board issued the following findings:

"The investigation resulted in a decision by this office that Ronnie Romans was a supervisor within the meaning of section 2(11) of the act, and, therefore, not entitled to the protection given to employees in section 8 of the act.

"The evidence disclosed the following supervisory indicia, *inter alia,* possessed by Mr. Romans which resulted in this determination; authority to hire, transfer, assign, lay off, and discharge employees or to effectively recommend such action and rating of employees as to performance and cooperation."

October 24, 1961, Mr. Romans filed a claim for unemployment compensation with the Michigan employment security commission and a redetermination was issued holding him disqualified for benefits under section 29(1)(a)(2) of the Michigan employment security act (CLS 1961, § 421.29 [Stat Ann 1960 Rev § 17.531]) on the ground that he was discharged by Standard Automotive Parts for reasons constituting misconduct in connection with his work. Claimant then filed an appeal and a hearing was held December 21, 1961, before a referee who affirmed the redetermination. An appeal to the employment security appeal board was filed by Mr. Romans and a hearing was held May 4, 1962, resulting in a decision reversing the hearing referee and holding that the conduct of the claimant which caused his discharge from his employment on October 23, 1961, did not constitute misconduct connected with his work within the meaning of section 29(1)(a)(2) of the employment security act, and the claimant was not disqualified for benefits.

Standard Automotive Parts Company timely filed a petition for writ of certiorari in the circuit court

for the county of Muskegon and the writ issued as a matter of course. Following hearing, the circuit judge entered judgment setting aside the opinion and decision of the appeal board and adopting the findings of fact of the referee. From that decision claimant appealed to the Michigan Supreme Court and leave to appeal was granted. The case was subsequently transferred to the Court of Appeals.

The precise questions on appeal, unlike the fact situation, are in considerable dispute, the appellee charging the appellant with raising two spurious issues and one partially spurious issue, each party going off in his own direction to discuss the questions as he sees them.

Since we have before us for review a decision of a circuit court, and since that is the matter appealed from, it appears that the interests of both parties are best served by examining the holding of that court in the light of the material supplied by each side. Herewith we set forth the opinion as filed by the court:

"This is an appeal by certiorari from a decision of the appeal board of the Michigan employment security commission.

"I will not burden this record by reciting the facts which may be learned from a reading of the record returned to this court. The case involves the answer to three questions as follows:

"1. Was the appeal board bound by the findings of the regional director of the national labor relations board that at the time of his discharge claimant was in fact and law a 'supervisor' within the meaning of the national labor relations act, and, as such, not an employee for the purposes of that act?

"In my opinion, a reading of this record establishes beyond any doubt whatever that the claimant in this case was in fact a supervisor and officer of this company. Therefore, the court answers the above question, 'Yes'.

"2. Did plaintiff and appellant, Standard Automotive Parts Company, have the right under the Michigan employment security act to expect as a standard of behavior of a 'supervisor' within the meaning of the national labor relations act, that claimant as such 'supervisor' would refrain from aiding and assisting a labor organization by remaining neutral during the organizational campaign of the union?

"This question the court also answers, 'Yes'.

"3. Is it a discharge for 'misconduct', within the meaning of the Michigan employment security act, if such a 'supervisor', whom the employer is informed by the union is one of its organizers, is discharged for refusing to sign a document disavowing his right to engage in such organizational activity and containing his promise to remain neutral?

"The Court also answers 'Yes' to this question.

"The opinion of the Honorable Morton S. Snow, referee of the Michigan employment security commission, set forth on pages 90 through 95 of the return on file in this court, is hereby adopted as the opinion of this court.

"The finding of the appeal board will be set aside. The finding of the referee is affirmed."

Based on these three questions before the circuit court, and now before us for review, we examine first Standard's contention that the appeal board was bound by the findings of the regional director of the NLRB, and the claimant's contention that the circuit court erred in holding that the administrative determination of a regional director of the NLRB is binding as a matter of law upon the Michigan employment security appeal board.

Neither party seems to have this issue in focus. It is simply a question of whether the decision of the regional director of the NLRB on the supervisory status of defendant Romans under the labor-

management relations act is *res judicata* in these proceedings.

In general, the answer given by the courts to the question whether decisions of administrative tribunals are capable of being *res judicata* depends upon the nature of the administrative action involved. The doctrine of *res judicata* has been applied to administrative action that is characterized by the courts as "judicial" or "quasi judicial", while to administrative determinations of "administrative", "executive", or "legislative" nature, the rules of *res judicata* have been held to be inapplicable. 42 Am Jur, Public Administrative Law, § 161, p 520.

The fact finding by the regional director that the defendant Romans was a supervisor is not *res judicata* either as to any subsequent NLRB consideration of that matter or in any collateral proceedings such as the instant one. The fact finding made in the course of a regional director's decision whether or not to proceed to prosecution has no greater *res judicata* weight than such a fact finding made by a prosecuting attorney who refuses to prosecute a complaint. In this case, the regional director of the NLRB was acting as an agent of the general counsel in investigating an unfair labor practice charge to determine whether there was sufficient merit to proceed into the judicial realm of the NLRB, a hearing before a trial examiner. He merely declined to prosecute. See 29 USCA, §§ 153 and 160. The day after his decision was issued, the supervisory status of defendant Romans could have been fully litigated before the NLRB in a representation proceeding under 29 USCA, § 159, but it was not.

The plaintiff's case citations concerning the preemption doctrine that the national labor relations board has exclusive jurisdiction over matters within the jurisdiction of the labor-management relations

act are not in point on the issue of whether the claimant is disqualified from receiving unemployment benefits.

The precise situation before us is that we are concerned with a definition under a Federal act and under a different State act dealing with a different matter. This matter becomes one of pedantic interest when we realize that the claimant undoubtedly is a supervisor by the very nature of his work.

This brings us to the nub of the contention between the parties. The appeal board, in its opinion, states, "On the other hand it is undoubtedly true that the claimant had limited supervisory authority and there were areas in which his judgment and discretion were relied upon by the employer." Under the disjunctive test contained in the labor-management relations act,[*] there can be little doubt that the claimant Romans is a supervisor, though the appeal board makes no direct finding on this issue. Rather, the appeal board goes to what appears to us to be the heart of the matter in examining whether claimant's action in refusing to sign the document was "misconduct" such as to disqualify him for benefits.

An examination of the record leaves little doubt that the refusal to sign the document was the factor which precipitated his discharge.

"*Q.* All right. Now, when you were called in that morning, Monday morning, were you given any kind of a warning, did you have an opportunity— let's put it this way—did you have an opportunity to be brought into the plant afterwards and work or were you discharged at that time?

"*A.* Well, he wanted me to resign from being part of the union and he said I was a supervisor and that I didn't understand at the time that I was a supervisor, that I couldn't have any part in it. So, I

---

[*] See 29 USCA, § 152.—REPORTER.

asked him if I could make a phone call before I signed anything and he said no.

"*Q.* Then you were not permitted to go back to work after that Monday morning, you were discharged at that time?

"*A.* Right.

"*Q.* So, actually the only reason for the discharge was your refusal to sign?

"*A.* Yes."

And later in the hearing:

"*Referee:* Were you told why you were dismissed?

"*A.* (*By claimant*) Well, he told me I was a supervisor.

"*Referee:* Were you told why you were being dismissed? Didn't Mr. Girdley tell you that he either wanted you to agree not to take any active part in the organization of the union in the plant, in which case you could return to work, or if you refused to agree to it you would be terminated?

"*A.* (*By claimant*) Right.

"*Referee:* All right.

"*Q.* (*By Mr. Jackson*) But, before you refused did you ask to call for some advice?

"*A.* Yes, I did. He said no, it's now or never. I mean he said, it's sign this paper or get out.

"*Q.* Actually then he requested you to sign the letter?

"*A.* Yes.

"*Q.* And, you refused to sign the letter, was this when you were discharged?

"*A.* Yes."

In its analysis of this colloquy, the appeal board says in its decision:

"In our opinion, the referee was mistaken as to the cause of the claimant's discharge. The cause

was not the conduct of the claimant as a 'supervisor' but the claimant's declining to sign the document presented to him by the employer on October 23, 1961."

Appellee casts an entirely different interpretation upon this occurrence in the following language:

"The appeal board's finding that 'claimant requested opportunity to make a telephone call for the purpose of consulting those who had assisted him in formulating his views about his status'; that, 'The claimant's request was denied'; and that 'we consider the employer's demand that the claimant sign the document without opportunity for the claimant to resolve his thinking on the matter and to receive appropriate advice and counsel, was unreasonable' is nothing more or less than a finding that claimant had the right to engage in *one more act of involvement with the union,* for the record is clear that he wanted advice of the union through the telephone call. The very purpose of the document he was asked to sign was to cause him to cease further union activities and to become neutral, and the admitted purpose of the telephone call would have been to seek further advice and counsel from the union. Thus, in refusing to allow the telephone call there was nothing more involved than a refusal to allow claimant *one more involvement with the union*—a matter which appellee sought to stop forthwith. Appellee had the right to stop claimant's union activities forthwith, and not to allow *one more act of union involvement* by claimant, for if the union had advised claimant not to sign, the telephone call would only have delayed the time of discharge, but if the union had advised that claimant sign, the appellee might well have concluded that claimant was not in good faith in signing, for the appellee would have had the right to conclude that claimant was still taking his orders from the union—not from management. Thus, the denial of the right

to make the telephone call is an insignificant trifle, and the denial is consistent with the standard of behavior which appellant had the right to expect of a supervisor—that he refrain from union activities." (Emphasis supplied.)

It is noted that the letter from the International Association of Machinists is dated October 19, 1961, the phraseology being cast in the future tense: "The following employees *will be* actively engaged in carrying on this campaign." (Emphasis supplied.)

The document presented to the claimant is dated October 20, 1961, the next day, and requotes this portion of the letter, and likewise its own tenor is in the future tense: "I will remain neutral, * * * I will not become or remain a member of this labor organization * * * I will do nothing to assist, aid or promote * * * ."

In the light of these phrases, and the manner in which they are cast, it is difficult to fathom the appellee's rejection of the request to make a telephone call as "one more act of involvement with the union".

We cannot conclude, as does appellee, that the matter of the telephone call was an "insignificant trifle". Rather, it appears from an exhaustive study of the briefs and record that the appeal board was correct in finding that claimant's refusal to sign the document was not disqualifying conduct, *i.e.,* wanton and willful disregard of the employer's interests. The peremptory nature of the order to sign and the confusion of claimant as to his status militate against a finding of misconduct.

Finally, in an overall consideration of the second two questions as decided by the circuit court, it is difficult to see how even a supervisory employee's adamant refusal to sign any such "loyalty oath" could be construed as misconduct, disqualifying him

from unemployment compensation. Actual assistance to an organizing union by a supervisor could be considered misconduct, but not mere refusal to sign a "loyalty oath". It is clearly evident the employer attempts to construct such an act of misconduct from the request of claimant Romans to make a phone call to ascertain his rights.

The appeal board determined that the facts, as set out here, did not constitute misconduct and the circuit court opinion reversed this finding. We cannot say that on the record before us that misconduct has been demonstrated to the extent that disqualification is established under section 29(1)(a)(2) of the Michigan employment security act.

Accordingly, the decision and order of the circuit court of Muskegon county are reversed and the matter remanded to the Michigan employment security commission for proceedings in conformity with the order of the appeal board.

Claimant may recover his costs.

BURNS and J. H. GILLIS, JJ., concurred.